# Illinois Official Reports

## Appellate Court

*City of Chicago v. Alexander*, 2015 IL App (1st) 122858-B

| | |
|---|---|
| Appellate Court Caption | THE CITY OF CHICAGO, a Municipal Corporation, Plaintiff-Appellant, v. TIEG E. ALEXANDER[1] *et al.*, Defendants-Appellees. |
| District & No. | First District, Second Division<br>Docket No. 1-12-2858 |
| Filed | December 22, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, Nos. 11-MC1-23771801 *et al.*; the Hon. Thomas More Donnelly, Judge, presiding. |
| Judgment | Reversed and remanded for further proceedings. |
| Counsel on Appeal | Stephen R. Patton, Corporation Counsel, of Chicago (Benna Ruth Solomon, Myriam Zreczny Kasper, and Kerrie Maloney Laytin, Assistant Corporation Counsel, of counsel), for appellant.<br><br>People's Law Office (Sarah Gelsomino, John L. Stainthorp, and Janine Hoft, of counsel), Law Office of Molly Armour (Molly Armour, of counsel), and Durkin & Roberts (Thomas Anthony Durkin, Janis D. Roberts, and Joshua G. Herman, of counsel), all of Chicago, and Law Office of John D. Cline, of San Francisco, California (John D. Cline, of counsel), for appellees. |

---

[1]See Appendix A for a list of all defendants.

PRESIDING JUSTICE PIERCE delivered the judgment of the court, with opinion.
Justices Harris and Liu concurred in the judgment and opinion.


**OPINION**

¶ 1     Chapter VII, section B.2, of the Chicago Park District Code (Code) prohibits persons from remaining in Chicago parks from 11 p.m. to 6 a.m. Chicago Park District Code, ch. VII, § B.2 (amended July 28, 1992); see also Chicago Municipal Code § 10-36-185 (added Apr. 21, 1999). According to an official with the Chicago park district, the purpose of the ordinance is "to keep parks safe, clean, attractive and in good condition" by allowing "park employees to collect trash, make repairs to park facilities, and maintain the landscaping." Defendants were arrested when they failed to vacate Grant Park after being advised of the terms of the ordinance and after numerous warnings that they were in violation of the ordinance. The circuit court dismissed the charges, finding the ordinance was facially unconstitutional and unconstitutional as applied to defendants as it violated principals of equal protection. Plaintiff City of Chicago (City) argues on appeal that the circuit court erred in granting defendants' motions to dismiss because the ordinance is constitutional on its face and constitutional as applied to these defendants. We agreed with the City that the circuit court erred in granting defendants' motion to dismiss because the ordinance was not unconstitutional and reversed its decision. In a supervisory order, our supreme court instructed us to vacate our order and to review the circuit court's judgment that the ordinance violates the right to free assembly under both the first amendment to the United States Constitution (U.S. Const., amend. I) and article I, section 5 of the Illinois Constitution (Ill. Const. 1970, art. I, § 5). Accordingly, we have vacated our original opinion and enter this opinion in its stead.

¶ 2                              BACKGROUND

¶ 3     Defendants[2] were protestors affiliated with Occupy Chicago, a grass roots political movement challenging wealth inequality. The Occupy movement is a branch of the Occupy Wall Street movement that protests against social and economic inequality with its primary goal focused on economic and political relations and wealth inequality. According to defendants, the Occupy movement "communicates this message through continuous occupation of a physical location" and this "non-violent occupation is the movement's chosen form of expression." "The expression of occupation highlights occupiers' willingness to contribute their bodies to the cause and undergo physical discomfort in order to bring attention to the desperate economic situation."

¶ 4     On September 22, 2011, Occupy Chicago protestors began demonstrating on the sidewalks in Chicago's financial district. Specifically, the protestors demonstrated in front of the Federal Reserve building, the Chicago Board of Trade and the Bank of America building in the vicinity

---

[2]There were 92 defendants who filed motions to dismiss the charges in a quasi-criminal proceeding before the circuit court. Twelve of the ninety-two defendants were represented by Durkin & Roberts and will be referred to herein as the "Durkin defendants." The remaining defendants were represented by members of the National Lawyers Guild and will be referred to as the "NLG defendants."

of Jackson and LaSalle Streets. The Chicago police department (CPD) permitted protestors to remain on the sidewalks in that area for up to 24 hours per day but did not allow the protestors to store provisions, erect structures or block traffic.

¶ 5    From its beginning, Occupy Chicago began to receive large quantities of supplies from supporters at Jackson and LaSalle Streets. When the Federal Reserve police informed protestors that they could not store their supplies along side of the bank, Occupy Chicago reached an agreement with the CPD to store these supplies on the edge of the sidewalk. On September 29, 2011, the CPD issued Occupy Chicago a "move it or throw it away" ultimatum, contrary to their prior agreement about storage of supplies. Occupy Chicago secured an off-site storage location and moved most of their supplies off the sidewalk. More supplies and donations arrived and the Chicago police informed Occupy Chicago members that their efforts in removing their belongings were insufficient and anything still on site at 9 a.m. the next morning would be confiscated by the CPD. Protestors then moved across LaSalle Street to the Bank of America building. At this location, the CPD informed protestors that they needed to keep their belongings moving at all times otherwise they would be disposed of.

¶ 6    On October 15, 2011, Occupy Chicago conducted a rally near the intersection of Jackson and LaSalle Streets. Protestors then marched around downtown Chicago for approximately one hour and entered Grant Park at the northeast corner of Michigan Avenue and Congress Parkway, commonly known as Congress Plaza.

¶ 7    Grant Park is often referred to as "Chicago's front yard." Generally located between Randolph Street on the north, Roosevelt Road on the south, Lake Michigan on the east and Michigan Avenue on the west, this public park contains entertainment venues, gardens, art work, sporting and harbor facilities within its 319 acres. *Grant Park (Chicago)*, Wikipedia, http://en.wikipedia.org/wiki/Grant_Park_(Chicago) (last visited Dec. 15, 2015). Congress Plaza is the ceremonial entrance on the park's center west side at the foot of Congress Parkway. Congress Plaza consists of two semicircular plazas located on each side of the heavily travelled Congress Parkway thoroughfare. Each plaza contains gardens, fountains, and artwork, including a pair of large bronze warrior statues, The Bowman and The Spearman, that are positioned like gatekeepers to the park. *Grant Park*, Chicago Park District, http://www.chicagoparkdistrict.com/parks/grant-park/ (last visited Dec. 15, 2015).

¶ 8    According to defendants, they were directed to this area by the Chicago police. The protestors made speeches over a public announcement (PA) system and erected 30 tents in this area of Grant Park and chanted that they would not leave the park.

¶ 9    Throughout the evening, CPD command personnel communicated with protestors and attorneys from the National Lawyers Guild (NLG) and informed the protestors that they would not be allowed to remain in Grant Park after it closed at 11 p.m. Attorneys from the NLG informed the protestors that they would have to vacate Grant Park by 11 p.m., as required by park district ordinance and that if they remained in the park, they would be arrested. The CPD estimated that there were approximately 3,000 protestors in Grant Park at around 7:15 p.m., with that number declining to about 700 around 8 p.m.

¶ 10    Prior to 11 p.m., using a PA system, the CPD read the park district ordinance to the protestors who remained in Congress Plaza and informed them that if they remained in Grant Park past 11 p.m., they would be arrested. Some protestors relocated across the street to the sidewalk on the west side of Michigan Avenue in front of Roosevelt University. Approximately 300 protestors remained in Grant Park after the 11 p.m. curfew.

¶ 11    At approximately 1 a.m. on October 16, 2011, the CPD used the PA system again to warn protestors that the park was closed. The CPD then asked each protestor individually whether he or she wanted to leave the park or be arrested. The CPD then arrested the 173 protestors who refused to leave after these warnings and charged them with violating chapter VII, section B.2, of the Code.[3]

¶ 12    On October 22, 2011, Occupy Chicago protestors staged another rally in the vicinity of Jackson and LaSalle Streets. There were approximately 1,500 protestors at 7 p.m. when the group left the financial district marching again to Congress Plaza. The CPD heard protestors chanting, "[t]he Occupation is not leaving!" Again, the CPD command personnel informed Occupy Chicago members and NLG attorneys that protestors would not be allowed to remain in Grant Park after it closed. Prior to 11 p.m., the CPD informed the protestors that that park closed at 11 p.m., and anyone who remained after 11 p.m. would be subject to arrest. After 11 p.m., the CPD again announced that the park was closed and that those who remained would be subject to arrest. Many protestors left the park and relocated across the street to the west side of Michigan Avenue in front of Roosevelt University. The CPD approached each protestor who remained in Grant Park and again asked if he or she wanted to leave the park or be arrested. After these warnings, the CPD arrested the 130 protestors and cited them for violating chapter VII, section B.2, of the Code.[4]

¶ 13    All protestors arrested after 11 p.m. on both October 16 and October 22 were given court dates in various criminal courthouses located throughout the City. Numerous *pro bono* attorneys appeared for defendants, including attorneys affiliated with the NLG and the law firm Durkin & Roberts. Some defendants entered pleas of guilty. Ninety-two defendants, all parties to this appeal, represented by Durkin & Roberts and NLG moved to dismiss the charges on the grounds that "their conduct as part of the Occupy Chicago protest at Grant Park on the night in question constituted expressive conduct or symbolic speech" that was protected by the first amendment. They further alleged that the charges violated their rights under the first

---

[3]The CPD has the authority to enforce certain provisions of the Code, including chapter VII, section B.2. Chicago Municipal Code § 10-36-185 (added Apr. 21, 1999). Section 10-36-185 states:

"(b) Any person who violates the above referenced provisions of the Chicago Park District Code shall be subject to a fine not to exceed $500.00 and shall be subject to an order requiring the violator to pay restitution when the violation involves damage to property.

(c) In addition to any other means authorized by law, the city may enforce this section by instituting an action with the department of administrative hearings." *Id*.

[4]A review of the record shows that defendants were charged with violating "10-36-185[,] Ch. VII B.2." As stated, section 10-36-185 of the Chicago Municipal Code authorizes Chicago police to enforce chapter VII, section B.2, of the Code, and makes a violation of chapter VII, section B.2, a Class C misdemeanor. However, in their motions to dismiss before the circuit court, both the Durkin defendants and the NLG defendants misstate the charges against them. Defendants state that they were charged with violating section 10-36-110 of the Chicago Municipal Code, which contains similar language as chapter VII, section B.2, of the Code and states: "No person shall be or remain in any public park, playground or bathing beach which is fenced in or provided with gates, between the closing of the gates at night and their reopening on the following day; nor shall any person be or remain in any public park, playground or bathing beach not fenced in or provided with gates between the hours of 11:00 p.m. and 6:00 a.m. on the following day." Chicago Municipal Code § 10-36-110 (amended Jan. 18, 2012). However, the trial court identified the correct charges and ruled on the constitutionality of the Code.

amendment and the fourteenth amendment equal protection clause of the United States Constitution. U.S. Const., amend. XIV, § 1. Specifically, the Durkin defendants argued that the ordinance and the City's selective enforcement of the ordinance violated their first amendment rights on the grounds that: (1) the ordinance is not narrowly tailored to serve significant government interest; (2) the ordinance and the City's enforcement of the ordinance fails to leave ample alternative channels of communication for defendants' speech; and (3) the ordinance is not content neutral in the present case because the City has not enforced the ordinance equally among speakers. The NLG defendants argued that their first amendment rights were violated when the City refused to provide protesters with an adequate forum in which to express their political views and petition for redress of grievances. In addition, the NLG defendants argued that their arrests violated their rights under the equal protection clause of the fourteenth amendment in that the ordinance was not uniformly enforced. On the motion of all defendants, the circuit court consolidated defendants' separate cases.

¶ 14    The City responded and included affidavits from a Chicago park district official and several police officers who were present during relevant times. The defendants responded and included affidavits. After oral argument on the motions, the City filed motions to strike defendants' affidavits. The court denied in part and granted in part the City's motion to strike the affidavits.

¶ 15    On September 27, 2012, the circuit court found chapter VII, section B.2, of the Code to be unconstitutional on its face and as applied to defendants. The court held that the ordinance violated the first amendment to the United States Constitution and related provisions of the Illinois Constitution. The court further held that the ordinance had been discriminatorily enforced in violation of the equal protection clauses of the United States and Illinois Constitutions. It is from this order that the City now appeals.

¶ 16                                    ANALYSIS

¶ 17    The Chicago park district is responsible for operating public parks and other public property in Chicago. 70 ILCS 1505/7.01 (West 2010). Pursuant to its authority, the park district enacted an ordinance to keep parks safe and maintained by prohibiting any person from being, remaining or leaving "any vehicle in any park not fenced in or provided with gates, between the hours of 11 p.m. and 6 a.m. on the following day." Chicago Park District Code, ch. VII, § B.2 (amended July 28, 1992). The penalty for violating this ordinance is a fine not to exceed $500 and restitution in the event of property damage. Chicago Municipal Code § 10-36-185 (added Apr. 21, 1999). The Code has the same force as a municipal ordinance. *Chicago Park District v. Canfield*, 382 Ill. 218, 223-24 (1943). The City argues that the park district ordinance prohibiting persons from remaining in Chicago parks from 11 p.m. until 6 a.m. is constitutional on its face and as applied to defendants and therefore the circuit court erred in granting defendants' motion to dismiss.

¶ 18    "In construing the validity of a municipal ordinance, the same rules are applied as those which govern the construction of statutes." *Napleton v. Village of Hinsdale*, 229 Ill. 2d 296, 306 (2008). Like statutes, municipal ordinances are presumed constitutional. *Chicago Allis Manufacturing Corp. v. Metropolitan Sanitary District of Greater Chicago*, 52 Ill. 2d 320, 327 (1972). The party challenging the ordinance has the burden of establishing a clear constitutional violation. *People v. One 1998 GMC*, 2011 IL 110236, ¶ 20. We review the constitutionality of an ordinance *de novo*. *Id.* We similarly review the grant of a motion to

dismiss *de novo*. *Porter v. Decatur Memorial Hospital*, 227 Ill. 2d 343, 352 (2008).

¶ 19                                    I. First Amendment

¶ 20    The first amendment to the United States Constitution, made applicable to the states through the due process clause of the fourteenth amendment, prohibits governmental action that "abridg[es] the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const., amends. I, XIV.

> "It was not by accident or coincidence that the rights to freedom in speech and press were coupled in a single guaranty with the rights of the people peaceably to assemble and to petition for redress of grievances. All these, though not identical, are inseparable. They are cognate rights, [citation], and therefore are united in the First Article's assurance." *Thomas v. Collins*, 323 U.S. 516, 530 (1945).

¶ 21    Although the first amendment speaks of the freedom of speech, it also extends to expressive conduct. *Texas v. Johnson*, 491 U.S. 397, 404 (1989). Generally speaking, the first amendment prevents the government from proscribing speech or expressive conduct because of disapproval of the ideas expressed. *City of Chicago v. Pooh Bah Enterprises, Inc*., 224 Ill. 2d 390, 406-07 (2006).

¶ 22    Although defendants mention generally their right to assembly in the context of the first amendment, the focus of defendants' argument in this court is that they were engaged in "political speech," "protected speech," "expressive speech," and "expressive conduct," which are protected by the first amendment, when they were arrested. The mere manner in which defendants choose to convey their message leaves no doubt that the exercise of their rights to freedom of speech, expression and assembly are intertwined. Nevertheless, "[t]he rights of free speech and assembly, while fundamental in our democratic society, still do not mean that everyone with opinions or beliefs to express may address a group at any public place and at any time." *Cox v. Louisiana*, 379 U.S. 536, 554 (1965).

¶ 23    The first amendment, while offering a host of protections, does not guarantee the right to employ every conceivable method of communication at all times and in all places. *Heffron v. International Society for Krishna Consciousness, Inc.*, 452 U.S. 640, 647 (1981). A public park is a place traditionally dedicated to free expression. *United States v. Albertini*, 472 U.S. 675, 687 (1985). The circuit court stated the obvious: Grant Park is a quintessential public forum.

¶ 24    Illinois has long recognized that municipal corporations have the right to adopt regulatory provisions governing the use of public property to the extent that such regulations are compatible with constitutional guaranties of free speech and press. *Lyons*, 39 Ill. 2d at 587. However, not every regulatory provision will pass constitutional muster.

¶ 25    The circuit court in this case found the park district ordinance unconstitutional on its face and as applied to defendants. An ordinance is facially unconstitutional if it is unconstitutional in every situation. *United States v. O'Brien*, 391 U.S. 367, 376-77 (1968). By contrast, an ordinance is unconstitutional as applied if a particular application of the statute is unconstitutional. *Napleton*, 229 Ill. 2d at 306. "[I]f a plaintiff prevails in an as-applied claim, he may enjoin the objectionable enforcement of a statute only against himself, while a successful facial challenge voids enactment in its entirety and in all applications." *Morr-Fitz,*

*Inc. v. Blagojevich*, 231 Ill. 2d 474, 498 (2008) (citing *Napleton*, 229 Ill. 2d at 306). Where a statute or ordinance is constitutional as applied to a party, a facial challenge will also fail, since there is necessarily at least one circumstance in which the statute or ordinance is constitutional. *Horvath v. White*, 358 Ill. App. 3d 844, 854 (2005); see also *Freed v. Ryan*, 301 Ill. App. 3d 952, 958 (1998). This court has a duty to uphold the constitutionality of a statute when reasonably possible and, therefore, if a statute's construction is doubtful, a court will resolve the doubt in favor of the statute's validity. *Napleton*, 229 Ill. 2d at 306-07.

¶ 26 Before we begin our analysis we must note that the parties agree that the ordinance in question is content neutral. A regulation is content neutral so long as it is "justified without reference to the content of the regulated speech." (Emphasis and internal quotation marks omitted.) *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). Generally, laws that confer benefits or impose burdens on speech without reference to the ideas or views expressed are content neutral. *Turner Broadcasting System, Inc. v. Federal Communications Comm'n*, 512 U.S. 622, 643 (1994). The ordinance in question does not, on its face, regulate speech, nor is it permissive in allowing one type of speech over another. Rather, the ordinance regulates conduct, and prohibits *anyone* from remaining in a public park between the hours of 11 p.m. and 6 a.m. The ordinance applies to all 595 parks in the City, including Grant Park's 319 acres, which encompasses Congress Plaza. Furthermore, the parties do not dispute that the City has a legitimate interest in keeping Chicago parks safe and well-maintained. Preserving the parks' cleanliness by allowing City workers adequate time to clean them, maintaining the parks' beauty by preventing the facilities from becoming overfatigued and protecting the public safety by preventing the commission of crimes in the park between 11 p.m. and 6 a.m. are substantial governmental interests, all legitimately encompassed by the narrowly drawn ordinance that in no way references protected speech.

¶ 27 A. Facial Challenge

¶ 28 We first address the City's argument that the park district ordinance should survive a facial challenge because not every conceivable application of the ordinance violates the first amendment and the ordinance is not substantially overbroad. We note that the City claims that the defendants did not make a facial challenge to the ordinance in the circuit court, and our review of the record reveals that a true facial challenge was never advanced by the defendants. However, the Durkin defendants claim that they challenged the ordinance both on its face and as applied. Given that the circuit court found the ordinance to be unconstitutional on its face, we will address the City's argument that the ordinance is facially constitutional.

¶ 29 Facial invalidation " 'is, manifestly, strong medicine that has been employed by the Court sparingly and only as a last resort.' " *National Endowment for the Arts v. Finley*, 524 U.S. 569, 580 (1998) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973)). A content-neutral regulation will be sustained under the first amendment if it advances important governmental interests unrelated to the suppression of free speech and does not substantially burden more speech than necessary to further those interests. *Turner Broadcasting System, Inc. v. Federal Communications Comm'n*, 520 U.S. 180, 189 (1997); *O'Brien*, 391 U.S. at 376-77. A party raising a facial challenge under the free speech clause of the first amendment "must demonstrate a substantial risk that application of the provision will lead to the suppression of speech." (Internal quotation marks omitted.) *Pooh-Bah Enterprises, Inc. v. County of Cook*,

232 Ill. 2d 463, 473 (2009). The parties' particular circumstances are irrelevant in a facial challenge. *Jackson v. City of Chicago*, 2012 IL App (1st) 111044, ¶ 27.

¶ 30 There are two types of recognized facial challenges in the first amendment context. A law could be challenged on the basis that no set of circumstances exist under which the statute would be valid. *United States v. Stevens*, 559 U.S. 460, 472 (2010). A law can also be challenged as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep. *Id*. at 473.

¶ 31 The City argues that not every conceivable application of the park district ordinance violates the first amendment because it is clear that the ordinance, on its face, does not regulate expression at all, much less on the basis of content. The City argues that the ordinance instead prohibits a specific type of nonexpressive conduct, remaining in a park from 11 p.m. to 6 a.m., and so long as the ban is not based on the content of the expression, it is permissible. According to the City, there are many activities where enforcement of the ordinance is constitutional. For example, those engaged in nonexpressive conduct, like picnickers, soccer players, joggers, chess players, musicians and stargazers do not have the right to use City parks between 11 p.m. and 6 a.m.

¶ 32 "The invalidity of the statute in one particular set of circumstances is insufficient to prove its facial invalidity." *In re M.T.*, 221 Ill. 2d 517, 536-37 (2006). " ' "[S]o long as there exists a situation in which a statute could be validly applied, a facial challenge must fail." ' " *Id*. at 537 (quoting *People v. Huddleston*, 212 Ill. 2d 107, 145 (2004), quoting *Hill v. Cowan*, 202 Ill. 2d 151, 157 (2002)). We agree with the City that there are many applications in which the ordinance is constitutional and therefore find that defendants have failed to establish the ordinance's facial invalidity. Grant Park is an expansive public park encompassing 319 acres. It includes Buckingham Fountain, the Art Institute of Chicago and the Museum Campus. The park contains performance venues, gardens, art work, sporting and harbor facilities and hosts public gatherings and several large annual events. *Grant Park*, Chicago Park District, http://www.chicagoparkdistrict.com/parks/grant-park/ (last visited Dec. 15, 2015). Chicagoans and tourists alike are drawn to Grant Park for all its many offerings and attractions. All of those visiting the park are engaged in nonexpressive conduct, whether they are there to enjoy its world class gardens, play a game of softball or visit Buckingham Fountain, are prohibited from doing so between the hours of 11 p.m. and 6 a.m.

¶ 33 The City also argues that the park district ordinance is not substantially overbroad. "The United States Supreme Court has provided this expansive remedy out of concern that the threat of enforcement of an overbroad law may deter or chill constitutionally protected speech, especially when the statute imposes criminal sanctions." *People v. Clark*, 2014 IL 115776, ¶ 11 (citing *Virginia v. Hicks*, 539 U.S. 113, 119 (2003)). A statute may be invalidated on overbreadth grounds only if the overbreadth is substantial and there is a realistic danger that the statute " 'will significantly compromise recognized First Amendment protections of parties not before the Court.' " *Board of Airport Commissioners v. Jews For Jesus, Inc.*, 482 U.S. 569, 574 (1987) (quoting *Members of the City Council v. Taxpayers for Vincent*, 466 U.S. 789, 801 (1984)).

¶ 34 The ordinance is not overbroad as it is specifically limited to City parks and only prohibits their use for seven hours during the late evening and early morning. There is no dispute in this case that the ordinance's stated purpose is "to keep parks safe, clean, attractive and in good condition" by allowing "park employees to collect trash, make repairs to park facilities, and

maintain the landscaping." The ordinance does not prohibit anyone from conducting their expressive activities or assembling on public sidewalks or in other public space adjacent to park property if they wish to do so. This is evident by the seamless transition of the Occupy protestors from the east side to the west side of Michigan Avenue. This transition did not impact Occupy's voice or visibility although it did affect its configuration changing it from a "circular" gathering to a "linear" demonstration. We find the ordinance is clearly a constitutionally appropriate application of a permissible government regulation. To the extent the ordinance may restrict expressive conduct or assembly, there is simply no evidence in this record that warrants a conclusion that there are a substantial number of instances in which the ordinance cannot be applied constitutionally in relation to its "plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010). Given that the ordinance applies only to Chicago parks during a reasonably limited time period, we hold that the ordinance is not unconstitutional on its face under the first amendment.

¶ 35                                    II. As-Applied Challenge

¶ 36     The City argues that the park district ordinance is constitutional as applied to defendants generally. In an as-applied challenge, "a plaintiff protests against how an enactment was applied in the particular context in which the plaintiff acted or proposed to act, and the facts surrounding the plaintiff's particular circumstances become relevant." *Napleton*, 229 Ill. 2d at 306. In short, an as-applied challenge "requires a party to show that the statute violates the constitution as the statute applies to him." *People v. Brady*, 369 Ill. App. 3d 836, 847 (2007) (citing *People v. Garvin*, 219 Ill. 2d 104, 117 (2006)).

¶ 37     The first amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired. *People v. Jones*, 188 Ill. 2d 352, 356 (1999). A state may therefore impose reasonable restrictions on the time, place or manner of constitutionally protected speech occurring in a public forum. *Rock Against Racism*, 491 U.S. at 790. A valid time, place and manner regulation, however, must be content neutral, narrowly tailored to serve a significant governmental interest and leave open alternative means for communication of the information. *Jones*, 188 Ill. 2d at 356-57.

¶ 38     In its brief before this court, the City suggests that *United States v. O'Brien*, 391 U.S. 367 (1968), which created a test for content-neutral regulation of conduct with an incidental effect on expression, applies here. The *O'Brien* Court stated:

> "[A] governmental regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is not greater than is essential to the furtherance of that interest." *Id*. at 377.

The City acknowledges and defendants agree that there is little, if any difference, between the *O'Brien* test and the standard applied to time, place and manner restrictions on expression. See *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 298 (1984). We need not determine which analysis is more appropriate in this instance for the results are the same.

¶ 39     Defendants take issue with the City's failure to show that the ordinance is narrowly tailored to serve a substantial governmental interest. In order to satisfy the "narrow tailoring" requirement, a regulation need not be " ' "the least restrictive or least intrusive means of [achieving the stated governmental interest]." ' " *Mastrovincenzo v. City of New York*, 435

F.3d 78, 98 (2d Cir. 2006) (quoting *Hobbs v. County of Westchester*, 397 F.3d 133, 149 (2d Cir. 2005), quoting *Rock Against Racism*, 491 U.S. at 798). Instead, the requirement is satisfied if the substantial governmental interest that the law is designed to serve would be achieved less effectively in the law's absence and the law does not burden substantially more speech than is necessary to further the government's objective. *City of Chicago v. Pooh Bah Enterprises, Inc.*, 224 Ill. 2d 390 (2006).

¶ 40        Here, as evidence that the ordinance is narrowly tailored, the City provided the affidavit of park district official Alonzo Williams. Williams averred that it was necessary to close the parks from 11 p.m. to 6 a.m. daily, in order to keep the parks safe, clean, attractive and in good condition. Williams stated:

> "We believe the Code's standard hours of closure is necessary to properly protect and maintain our parks. The park hours of closure allow park employees to collect trash, make repairs to park facilities, and maintain the landscaping. Park employees are therefore able to make sure the parks remain sanitary and pleasing to the eye with limited disruption and maximum safety to park patrons. Park closures also ensure that certain park facilities do not become over-fatigued. Further, limited access by pedestrians during park closure hours reduces crime against park patrons and park property. As we are charged with keeping Chicago's parks beautiful and vibrant for current and future generations, we have made certain rules to that effect. Round-the-clock use of the parks by the general public would not further our mandate and would instead make it impossible to uphold."

¶ 41        The City argues that closing the parks overnight is not more substantially restrictive than necessary to serve the park district's interest in maintaining and preserving the parks. We find *Clark v. Community for Creative Non-Violence*, 468 U.S. 288 (1984), to be instructive on this issue.

¶ 42        The *Clark* Court upheld an overnight camping ban after finding that the government had a substantial interest in conserving park property. The Court stated "[i]t is also apparent to us that the regulation narrowly focuses on the Government's substantial interest in maintaining the parks in the heart of our Capital in an attractive and intact condition, readily available to the millions of people who wish to see and enjoy them by their presence." *Id*. at 296. The Court went on to say that "[i]f the Government has a legitimate interest in ensuring that the National Parks are adequately protected, which we think it has, and if the parks would be more exposed to harm without the sleeping prohibition than with it, the ban is safe from invalidation under the First Amendment as a reasonable regulation of the manner in which a demonstration may be carried out." *Id*. at 297. The Court also rejected the notion that because there are less restrictive alternatives to satisfy the government's interest in protecting the parks than banning camping, the ban on camping was unnecessary and therefore invalid.

> "[T]hese suggestions represent no more than a disagreement with the Park Service over how much protection the core parks require or how an acceptable level of preservation is to be attained. We do not believe, however, that either *** *O'Brien* or the time, place, or manner decisions assign to the judiciary the authority to replace the Park Service as the manager of the Nation's parks or endow the judiciary with the competence to judge how much protection of park lands is wise and how that level of conservation is to be attained." *Id.* at 299.

¶ 43    As in *Clark*, we believe that the park ordinance in question here "responds precisely to the substantive problem which legitimately concerns the [government]." *Members of the City Council v. Taxpayers for Vincent*, 466 U.S. 789, 810 (1984). The use of City parks during the hours of 11 p.m. and 6 a.m. would impede the City's ability to achieve its goals of maintenance, preservation and crime reduction. "[T]he city's interest in attempting to preserve [or improve] the quality of urban life is one that must be accorded high respect." *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 71 (1976). It is irrelevant that the park district's ends might be served in a different or less restrictive manner. *Clark*, 468 U.S. at 299.

¶ 44    Referencing events that occurred in and around Grant Park during the past 200 years, the trial court concluded that "[I]f the City repeatedly make [*sic*] exceptions to the seven-hour closing rule, that is inconsistent with the notion that closing Grant Park every night for seven hours is necessary for park maintenance and preservation." The court went on to conclude there was no evidentiary justification for keeping the park closed "forty-nine hours every week" citing the affidavit advancing the need to collect trash, make repairs and maintain landscaping. The court is not given the luxury of substituting its judgment for that of the park district as to the amount of time necessary for the park district to competently perform its maintenance responsibility. The trial court's comments also reflect the opinion of the trial judge that he does not believe seven hours a night is a reasonable amount of time to perform maintenance functions on a park system as vast as the Chicago Park District. This is not a view we share. The trial judge's observation does not address the notion that these defendants were not interested in a one-time "assembly": the defendants intended to remain in the park for an unspecified period of time indicating a 24-hour, uninterrupted presence for days, weeks or months without end. Surely this would adversely impact the maintenance and public safety responsibilities of the park district and would result in the total substitution of the purported goals of these defendants, regardless of the righteousness of their movement, with the needs of the public at large.

¶ 45    Likewise, the City argues that the ordinance allows for ample alternatives for individuals or groups, similar to these defendants and the Occupy movement, seeking a place to express their message during the overnight hours when the parks are closed. We agree.

¶ 46    Much of defendants' time at oral argument was devoted to explaining their reasoning and desire to remain within Grant Park at the Congress Plaza location. Defendants stated that this particular area was "ideal" for their expression and assembly because it was a highly visible area of Grant Park that would provide maximum exposure to pedestrian and vehicular traffic. Defendants argued that the available alternative to that particular location, the sidewalk across the street on the west side of Michigan Avenue, was not an "ample alternative" because it required them to "occupy" in a less desirable configuration.

¶ 47    Defendants fail to recognize that in the context of the first amendment, an ample alternative mode of communication need not be their first choice. See *Taxpayers for Vincent*, 466 U.S. at 812. An alternative need not even require the employment of the same method of communication. See *id.* (acceptable alternative to a ban on posting literature was the individual's ability to speak or distribute the literature from the same location). Furthermore, it does not have to be an alternative that provides the same audience or impact for the speech. See *Ward*, 491 U.S. at 802. However, an adequate alternative cannot totally foreclose a speaker's ability to reach one audience even if it allows the speaker to reach other groups. See *Bery v. City of New York*, 97 F.3d 689, 698 (2d Cir. 1996) (holding that total ban on sidewalk art does

not leave open alternative means of communication because alternative display in galleries or museums would not reach the same audience).

¶ 48 Here, the record demonstrates that in the days prior to the events leading up to defendants' arrests, defendants were allowed to assemble and protest on City streets 24 hours a day. The record also shows that when protesters were asked to leave Grant Park after 11 p.m., protestors freely continued their protest on the sidewalk on the west side of Michigan Avenue across the street from the area in the park where the arrests took place. Although not their first choice, we are confident defendants' confederates reached the same audience that defendants targeted and suffered no impediment communicating their message to the same audience from a location that was within 100 feet from the restricted area.

¶ 49 Defendants argue, as they did in the trial court, that the ordinance was unconstitutional as applied to them because it was enforced in a discriminatory manner. In the trial court, the NLG defendants claimed that their arrests were unconstitutional under the equal protection clause of the fourteenth amendment because the ordinance was selectively enforced against them based on their viewpoint. The Durkin defendants claimed that their first amendment rights were violated because the City enforced the ordinance in a viewpoint discriminatory way. The trial court treated defendants' arguments as a quasi-equal protection argument grounded in the first amendment and found that the ordinance was unconstitutionally applied because the ordinance was selectively enforced based on the exercise of defendants' first amendment rights.

¶ 50 "[T]he First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others." *Taxpayers for Vincent*, 466 U.S. at 804. Equal protection requires that similarly situated individuals will be treated in a similar manner. *People v. Reed*, 148 Ill. 2d 1, 7 (1992). The equal protection clauses of the United States and Illinois Constitutions do not deny the state the power to draw lines that treat different classes of people differently, but prohibits the state from according unequal treatment to persons placed by a statute into different classes for reasons wholly unrelated to the purpose of the legislation. *People v. Shephard*, 152 Ill. 2d 489, 499 (1992). We use the same analysis in assessing equal protection claims under both the state and federal constitutions. *Reed*, 148 Ill. 2d at 7.

¶ 51 Exacting precision and equality in enforcement of state and local laws is not required by the Constitution. *Hameetman v. City of Chicago*, 776 F.2d 636, 641 (7th Cir. 1985). The decision whether to prosecute an offense is a matter within the discretion of the government. *Wayte v. United States*, 470 U.S. 598, 607 (1985). Unequal enforcement of a local ordinance is unconstitutional only if the inequality has some invidious purpose. *Dauel v. Board of Trustees*, 768 F.2d 128, 131 (7th Cir. 1985) (citing *Oyler v. Boles*, 368 U.S. 448, 456 (1962)). In order to successfully bring a selective enforcement claim under the equal protection clause, the challenging party must establish: (1) that he received different treatment from others similarly situated; and (2) the differing treatment was based on clearly impermissible or "invidious" grounds "such as discrimination on the basis of race, religion, the exercise of first amendment rights, or bad faith." *Ciechon v. City of Chicago*, 686 F.2d 511, 523 n.16 (7th Cir. 1982).

¶ 52 Defendants compare themselves to the hundreds of thousands of spectators who filled Grant Park on November 4, 2008, to witness President-elect Barack Obama's victory speech. According to defendants, this victory rally went well beyond 11 p.m. and not only did the City

not arrest the president-elect and countless other politicians, the City provided additional security for the event and did not enforce the ordinance against several thousand spectators.[5]

¶ 53    The City does not dispute that the Obama spectators were allowed to remain in the park beyond 11 p.m. The City argues, however, that in this case:

"It is undisputed that the City did not enforce the ordinance against defendants at the stroke of 11:00 p.m., either; defendants were not arrested until 1:00 a.m., and that was only after they were given multiple warnings and the opportunity to leave. Thus, between 11:00 p.m. and 1:00 a.m., CPD did not enforce the ordinance against numerous Occupy Chicago participants who left the park on their own volition. While arrests were made at 1:00 a.m., there is absolutely no evidence that anyone attending the Obama rally remained in the park after 1:00 a.m., much less in defiance of repeated warnings to leave."

¶ 54    Defendants argue that the two groups are similarly situated merely because they both violated the ordinance. The record does not allow us to determine the extent to which both the groups are similarly situated. We have no concrete information, and neither party provided any, as to what time the Obama spectators left, whether or to what extent they were asked to leave, whether any of the spectators chanted their intent to remain or "occupy" the park or whether they erected tents. When a party fails to make a showing that he is similarly situated, his equal protection challenge must fail. *Id.*

¶ 55    Even if a valid comparison between the two groups is made, we could not find them similarly situated based on their violation of the ordinance alone. As the name "Occupy Chicago" suggests, and as defendants readily admit, the participants intend to remain in or occupy a space for an unknown duration. Indeed, the NLG defendants' motion to dismiss states that "[a]n integral part of the OCCUPY movement is the continuous occupation of a location in the vicinity of the workplaces of the 1%. The occupation itself is part of the expressive act, in that it is intended to bring public outrage." Furthermore, the NLG defendants explained, "[a]n occupation, as opposed to a march or demonstration, has the ability to reach more people with its message because of its stationary location maintained over an extended period of time which provides participants a greater ability to communicate their message and attach additional supporters to their cause." The NLG defendants also stated that they were "determined to exercise [their] first amendment rights *** by occupying a location in Grant park *** and setting up tents to show that participants intended to occupy that area." By contrast, the estimated 240,000 Obama spectators gathered in Grant Park for the discrete, one-time purpose of witnessing Mr. Obama's historic presidential victory speech culminating with Mr. Obama's departure. There is no evidence as to how long the Obama spectators remained in the park, whether they were asked to leave, or whether they remained in the park after they were asked to leave. These distinctions prevent a meaningful determination of whether the two groups can be considered as similarly situated. We reject this argument.

¶ 56                                III. Rights Under the Illinois Constitution

¶ 57    The Illinois Supreme Court's supervisory order directed us to also review the circuit court's written judgment that the ordinance violates the right of free assembly under article I,

---

[5]The parties agree that the Obama rally was issued a permit. However, the permit issue is irrelevant here where the ordinance does not exempt permit holders from the curfew.

section 5 of the Illinois Constitution (Ill. Const. 1970, art. I, § 5). Although no defendant had raised the issue in the motions to dismiss and the thrust of defendants' claim is the exercise of their free speech rights ("[t]he occupation itself is part of the expressive act"), in its written judgment order, the circuit court *sua sponte* considered whether the ordinance also violated article I, section 5, of the Illinois Constitution.

¶ 58   The trial court analyzed the history of article I, section 5 and concluded that this provision affords greater protection to the right to assembly than provided by the United States Constitution and concluded the ordinance was constitutionally infirm under the Illinois Constitution stating:

"Reviewing the debates of the constitutional convention, it becomes clear that the delegates intended Illinois' protection to be broader in one very salient respect. While the U.S. Constitution accords protection to assemblies with an expressive purpose, the Illinois Constitution accords full protection to assemblies regardless of their expressive purpose. The 1970 constitution changed the text of the free assembly clause to assure that it protected all assemblies regardless of purpose. 6 Proceedings at 61-62 (report of the Bill of Rights Committee). Unanimously, the Bill of Rights Committee voted for this new version that assures the people the right to assemble in a peaceable manner even though their purpose is other than 'to consult for the common good, or to make known their opinions to their representatives, and to apply for redress of grievances.' *Id*. Putting a comma between the phrases 'peaceable manner' and 'consult for the common good' accorded protection to all as long as they gather peacefully. See 3 Proceedings at 1480 (June 3, 1970) (statement of Father Francis X. Lawlor, delegate and the member of the Bill of Rights Committee designated to speak on behalf of the committee with respect to free assembly.) The insertion of the comma created an unqualified, 'independent' right to assemble in a peaceable manner. Ill. Const. art. I, § 5; Ann M. Lousin, The Illinois State Constitution: A Reference Guide 47 (Praeger 2010). Thus, Illinois accords complete protection to assemblies regardless of purpose, embracing non-expressive assemblies. By contrast, the First Amendment protects only expressive assemblies."

¶ 59   In the trial court's view the ordinance was facially invalid under the Illinois Constitution because "Illinois extends free assembly protection to non-expressive assemblies that substantially increases the number of applications in which the Curfew would infringe of the right to free assembly." The trial court reasoned that "Illinois protects non-expressive assemblies of picknickers as well as expressive assemblies of protestors. Late night picnics or social assemblies fall within the protections of Illinois' free assembly clause." Thus, by logical extension, the circuit court would find that any assembly of two or more persons would be permitted within the park district at all times notwithstanding the stated reasons for the limited closure that we have found to be constitutionally permissible under the time, place and manner analysis.

¶ 60   A limited lockstep approach is employed when analyzing cognate provisions of the Illinois and United States Constitutions. *People v. Fitzpatrick*, 2013 IL 113449, ¶ 15. Under the limited lockstep approach, we "look first to the federal constitution, and only if federal law provides no relief turn to the state constitution to determine whether a specific criterion–for example, unique state history or state experience–justifies departure from federal precedent." (Internal quotation marks omitted.) *People v. Caballes*, 221 Ill. 2d 282, 309-10 (2006). In

utilizing the limited lockstep approach, our supreme court has declared that it would "not depart from the intent of the framers of the Illinois Constitution of 1970 or the understanding of voters who adopted it." *Id*. at 316. "We must find in the language of our constitution, or in the debates and the committee reports of the constitutional convention, something which will indicate that the provisions of our constitution are intended to be construed differently than are similar provisions in the Federal Constitution, after which they are patterned." *People v. Tisler*, 103 Ill. 2d 226, 245 (1984).

¶ 61  Our review of the 1970 Illinois Constitution debates and convention supports the conclusion that the framers intended for article I, section 5 to extend a broader right of assembly than that afforded under the United States Constitution. However, in our review, we find nothing to indicate that the time, place and manner analysis should be abandoned. The 1870 Illinois Constitution provided that "[t]he people have the right to assemble in a peaceable manner to consult for the common good, to make known their opinions to their representatives and to apply for redress of grievances." Ill. Const. 1870, art. I, § 5. The 1970 constitution changed article I, section 5 by inserting a comma after the word "manner" so that it now provides: "The people have the right to assemble in a peaceable manner, to consult for the common good, to make known their opinions to their representatives and to apply for redress of grievances." Ill. Const. 1970, art. I, § 5.

¶ 62  Delegate Lawlor stated that there was very little in the way of change to the right to assembly other than the insertion of a comma explaining that "[t]he purpose of inserting a comma after the word 'manner' was to assure that the right to assemble in a peaceable manner was an independent right, not subject to qualification by any of the succeeding phrases." He further explained that by making this an independent right "people have the right to assemble in a peaceable manner, even though their purpose is other than to consult for the common good, or to make known their opinions to their representatives, or to apply for redress of grievances." 3 Record of Proceedings, Sixth Illinois Constitutional Convention 1480 (statements of Delegate Lawlor) (hereinafter Proceedings) (delegate and the member of the Bill of Rights Committee designated to speak on behalf of the committee with respect to free assembly).

¶ 63  The creation of an independent right to assemble in a peaceable manner and the "divergence" from the federal constitution, however slight, in the 1970 Illinois Constitution does not mean that the delegates intended this independent right to be without limit. *Caballes*, 221 Ill. 2d at 297. Defendants have failed to cite to any authority, and we have not found any, that holds that those individuals who engage in protected nonexpressive assembly under the Illinois Constitution have a *greater* right than those individuals who assemble for an expressive purpose under either the United States or Illinois Constitutions. Defendants have not made citation to any authority that removes either expressive or nonexpressive assembly from constitutionally valid time, place and manner restrictions. "[R]easonable time, place, or manner regulations normally have the purpose and direct effect of limiting expression but are nevertheless valid." *Community for Creative Non-Violence*, 468 U.S. at 294. "Society generally and the inhabitants of any community have, it seems to us, a right to have publicly owned premises maintained in a sanitary and orderly condition. To that end municipal authorities may properly prohibit conduct thereon which violates that right unless the value to society of the proscribed conduct is deemed such as to outweigh the detriment to others resulting from such conduct." *Chicago Park District v. Lyons*, 39 Ill. 2d 584, 590 (1968).

¶ 64    Our finding that the time, place and manner analysis reflected in federal precedent is equally applicable when reviewing Illinois's independent right of peaceable assembly finds additional support in the constitutional convention record where the question was whether the amendment would limit "the power of the local government officials" to limit the number of people that might assemble based on the threat of violence? 3 Proceedings 1481 (statements of Delegate Mathias). Delegate Lawlor stated, "No, I think that comes under your general police power of the state and so forth, the right of the legislature to establish reasonable norms to control the proper functioning of society. I don't think that there is any intent whatever along that line." 3 Proceedings 1481 (statements of Delegate Lawlor) (delegate and the member of the Bill of Rights Committee designated to speak on behalf of the committee with respect to free assembly). Delegate Lawlor's statement makes clear that by creating a right to peaceably assemble there was no intention to afford more protection than that provided under the United States Constitution where reasonable restrictions as to time, place and manner of assembly are enacted.

¶ 65    For defendants to suggest that they are somehow engaging in peaceful assembly comparable to picnickers, stargazers or soccer players and are therefore protected under article I, section 5 is disingenuous at best. Defendants are not picnickers or stargazers or soccer players. They are members of a group assembled to make an important point. Their assembly rights were apparently accommodated through the night of their arrests in Grant Park. The ordinance did not restrict their assembly, it restricted their stated purpose to "occupy" and indefinitely remain in a public area to the detriment of the park district's ability to perform its legitimate functions. Free assembly under the Illinois Constitution is not without its limits. We find that the well established time, place and manner federal precedent employed in first amendment review under the United States Constitution applies equally to the analysis of a freedom to assemble claim under the Illinois Constitution. As a result, we find the ordinance does not violate article I, section 5, of the Illinois Constitution.

¶ 66                                    CONCLUSION

¶ 67    Based on the foregoing, we reject defendants' facial and as-applied challenges to the park district ordinance. We reject defendants' arguments that the selective enforcement of the ordinance violated the equal protection clause of the fourteenth amendment. We also find that the ordinance does not violate the article I, section 5, of the Illinois Constitution. We therefore reverse the judgment of the circuit court granting defendants' motions to dismiss and remand for further proceedings.

¶ 68    Reversed and remanded for further proceedings.

APPENDIX A
Defendants

| | | Case Nos. (cons.) |
|---|---|---|
| TIEG E. ALEXANDER, | ) | 11 MC1 23771801 |
| JOHN ANTIA, | ) | 11 MC1 26464001 |
| TIMOTHY AUMILLER, | ) | 11 MC1 24906701 |
| BRUCE E. BAILEY, | ) | 11 MC1 26463201 |
| MARK J. BANKS, | ) | 11 MC1 22286901 |
| JANICE K. BECKER, | ) | 11 MC1 24904101 |
| TAYLOR BEVILL, | ) | 11 MC1 26798501 |
| SAMUEL H. BRODY, | ) | 11 MC1 24904201 |
| BRIAN C. BROWN, | ) | 11 MC1 23772001 |
| JIM BURGER, | ) | 11 MC1 26469701 |
| ANTHONY CALDERON, | ) | 11 MC1 24936801 |
| JOHN M. CAMP, | ) | 11 MC1 24906201 |
| JOSEPH A. CARPENTER, | ) | 11 MC1 26798601 |
| RACHEL E. COHEN, | ) | 11 MC1 26288201 |
| BRIAN DAILEY, | ) | 11 MC1 26463001 |
| EMILY M. DAY, | ) | 11 MC1 23772901 |
| JENNIE S. DEAN, | ) | 11 MC1 24937001 |
| PATRICK DELSOIN, | ) | 11 MC1 24905701 |
| STEPHEN W. DOWNEY, | ) | 11 MC1 24904501 |
| FRANK M. EHRMANN, | ) | 11 MC1 26462501 |
| MARY J. FESENMAIER, | ) | 11 MC1 23773701 |
| MARY FESENMAIER, | ) | 11 MC1 26470301 |
| ALISON M. FESER, | ) | 11 MC1 26471901 |
| LEE P. FINNEGAN, | ) | 11 MC1 24936901 |
| ANDREA FORD, | ) | 11 MC1 26273801 |
| ANTON D. FORD, | ) | 11 MC1 26266801 |
| IRAMI FRIMPONG, | ) | 11 MC1 26293301 |
| MATTHEW M. FURLONG, | ) | 11 MC1 26465201 |
| VICTOR GARDUNO, | ) | 11 MC1 24925301 |
| NOAH E. GLASER, | ) | 11 MC1 26293401 |
| NATHAN J. GOLDBAUM, | ) | 11 MC1 22263001 |

| | | |
|---|---|---|
| DEBORAH GOLDGABER, | ) | 11 MC1 26470001 |
| GREGORY GOODMAN, | ) | 11 MC1 26268701 |
| GREGORY GOODMAN, | ) | 11 MC1 24936501 |
| RALPH R. GRATHOFF, | ) | 11 MC1 26497601 |
| LAURA A. GRAY, | ) | 11 MC1 24925101 |
| BRET E. HAMILTON, | ) | 11 MC1 22286101 |
| DEBRA S. HAMILTON, | ) | 11 MC1 24936201 |
| NATHAN A. HANAK, | ) | 11 MC1 26463601 |
| MARK J. HANNAN, | ) | 11 MC1 22264301 |
| MICHAEL D HARTGE, | ) | 11 MC1 26266901 |
| MEREDITH HEIDBREDEIR, | ) | 11 MC1 26463101 |
| NATHAN E. HENSLEY, | ) | 11 MC1 26497001 |
| MICHAEL HERBERT, | ) | 11 MC1 24926101 |
| SERENA HIMMELFARB, | ) | 11 MC1 24904401 |
| ROBERT M. JENNINGS, | ) | 11 MC1 26472101 |
| MATHEW JOHNSON, | ) | 11 MC1 22260701 |
| TERRENCE KEENAN, | ) | 11 MC1 24904901 |
| TOMASZ Z. KUCZBORSKI, | ) | 11 MC1 26292301 |
| JINCE KURUVILLA, | ) | 11 MC1 24906601 |
| NEIL G. LANDERS, | ) | 11 MC1 26268801 |
| KRISTY J. LUESHEN, | ) | 11 MC1 26472901 |
| ANDREW S. LUHRING, | ) | 11 MC1 26463301 |
| JEREMY LYNCH, | ) | 11 MC1 24905901 |
| RUTH G. MACIULIS, | ) | 11 MC1 26292901 |
| ANNIE L. MADIGAN, | ) | 11 MC1 26462101 |
| RICHARD MALMIN, | ) | 11 MC1 26499301 |
| JAMES A. MANOS, | ) | 11 MC1 26501101 |
| KEN S. MARSHALL, | ) | 11 MC1 23772101 |
| MICHAEL MCCLAIN, | ) | 11 MC1 26470701 |
| BRITTANY MOFFIT, | ) | 11 MC1 26474101 |
| ANDRADE MONICA, | ) | 11 MC1 22260801 |
| PATRICK G. OHARA, | ) | 11 MC1 26291601 |
| KERI M. ONDRUS, | ) | 11 MC1 26500801 |
| JUAN J. ORIBIO, | ) | 11 MC1 22286001 |
| BONNIE OSAI-FRIMPONG, | ) | 11 MC1 26500501 |
| DWIGHT W. OVERTON, | ) | 11 MC1 23772201 |
| YELANDA L. PEARSON, | ) | 11 MC1 26462801 |
| STEPHEN J. PEREZ, | ) | 11 MC1 22263701 |
| JAMES E PLANK, | ) | 11 MC1 26269401 |
| KELLY POPE, | ) | 11 MC1 26470901 |
| BEN J. QUEEN, | ) | 11 MC1 22291301 |
| ADAM J. RAHN, | ) | 11 MC1 23772601 |
| DOMINIQUE A. REID, | ) | 11 MC1 26266201 |
| RUBEN RODRIGUEZ, | ) | 11 MC1 26292101 |
| BRIT SCHULTE, | ) | 11 MC1 24905201 |
| BLAISE T. SEWELL, | ) | 11 MC1 42600901 |

| | | |
|---|---|---|
| JEREMY A. SIEGMAN, | ) | 11 MC1 26473101 |
| ROBERT L. SIMPSON, | ) | 11 MC1 24936101 |
| MICHAEL SONNENBERG, | ) | 11 MC1 26273701 |
| RYAN SPORER, | ) | 11 MC1 24906301 |
| KAILASH SRINIVASAN, | ) | 11 MC1 24906401 |
| LEE J. SUZUKI, | ) | 11 MC1 22263801 |
| FRANK L. SWANSON, | ) | 11 MC1 26474701 |
| ALIX A. TATE, | ) | 11 MC1 22286601 |
| TIMOTHY V. TROSS, | ) | 11 MC1 22260601 |
| ALEXANDER VELAZQUEZ, | ) | 11 MC1 26293901 |
| WILLIAM VILLACRES, | ) | 11 MC1 26497501 |
| DANIELLE M. VILLARREAL, | ) | 11 MC1 22285801 |
| KYLE N. YACKEY, | ) | 11 MC1 23773801 |
| JOSEPH A. YOUNG, | ) | 11 MC1 26464901 |
| JOSEPH A. YOUNG, | ) | 11 MC1 23003701 |
| | ) | |