# Illinois Official Reports

## Supreme Court

*City of Chicago v. Alexander*, 2017 IL 120350

| | |
|---|---|
| Caption in Supreme Court: | THE CITY OF CHICAGO, Appellee, v. TIEG E. ALEXANDER *et al.*, Appellants. |
| Docket No. | 120350 |
| Filed | June 15, 2017 |
| Decision Under Review | Appeal from the Appellate Court for the First District; heard in that court on appeal from the Circuit Court of Cook County, the Hon. Thomas More Donnelly, Judge, presiding. |
| Judgment | Appellate court judgment affirmed.<br>Circuit court judgment reversed and remanded. |
| Counsel on Appeal | Sara Gelsomino, of People's Law Office, John D. Cline, Molly Armour, Thomas Anthony Durkin, Janis D. Roberts, and Joshua G. Herman, all of Chicago, and Gabriel L. Mathless, of Moore & Van Allen PLLC, of Charlotte, North Carolina, for appellants.<br><br>Stephen R. Patton, Corporation Counsel, of Chicago (Benna Ruth Solomon, Myriam Zreczny Kasper, and Kerrie Maloney Laytin, Assistant Corporation Counsel, of counsel), for appellee.<br><br>Jessica DeWalt, of Illinois Municipal League, of Springfield, *amicus curiae*. |

Justices                  JUSTICE GARMAN delivered the judgment of the court, with opinion.

Chief Justice Karmeier and Justices Freeman, Thomas, Burke, and Theis concurred in the judgment and opinion.

Justice Kilbride dissented, with opinion.

## OPINION

¶ 1      Plaintiff, the City of Chicago, charged defendants, members of the "Occupy Chicago" movement, with violating chapter VII, section B(2), of the Chicago Park District Code (Chicago Park District Code, ch. VII, § B(2) (amended July 28, 1992)). The circuit court of Cook County dismissed the charges, finding that the ordinance was unconstitutional on its face and as applied to the defendants. The appellate court reversed, holding that the ordinance did not violate the defendants' right to assembly under the first amendment of the United States Constitution. On remand from this court's supervisory order directing it to review defendants' claim under article I, section 5, of the Illinois Constitution of 1970, the appellate court again reversed and remanded for further proceedings. 2015 IL App (1st) 122858-B, ¶ 67.

¶ 2      We allowed defendants' petition for leave to appeal pursuant to Illinois Supreme Court Rule 315 (eff. Jan. 1, 2015) to determine whether the ordinance, which closes all Chicago public parks between 11 p.m. and 6 a.m. and prohibits people from being inside any park during these hours, is unconstitutional as applied to defendants under article I, section 5, of the Illinois Constitution (Ill. Const. 1970, art. I, § 5).

¶ 3      For the reasons that follow, we affirm the judgment of the appellate court.

¶ 4                           BACKGROUND

¶ 5      Beginning on September 22, 2011, participants in the "Occupy Chicago" movement demonstrated in the financial district of Chicago, generally near the intersection of Jackson and LaSalle Streets. Initially, plaintiff, the City of Chicago (City), allowed the protestors to remain on sidewalks in the financial district with no time limitations. The City, however, prohibited the protestors from storing provisions, erecting structures, or blocking traffic. The Chicago Police Department (CPD) enforced those restrictions.

¶ 6      For approximately three weeks, protestors engaged in rallies, marches, protests, and assemblies in Chicago's financial district and adjacent downtown areas. CPD was present to maintain order and assist with traffic control but otherwise engaged in minimal policing of protestors' activities. CPD did, however, repeatedly require the protestors to remove or relocate supplies stored on the sidewalks. In at least one instance, CPD issued a "move it or throw it away" ultimatum, an order some protestors believed conflicted with prior CPD instructions.

¶ 7      On October 15, 2011, Occupy Chicago demonstrators conducted a rally near the intersection of Jackson and LaSalle Streets and then marched through the city for about an hour. CPD directed them to move into Grant Park near the intersection of Michigan Avenue and Congress Parkway, an area commonly known as Congress Plaza. After their arrival there,

protestors made speeches on a public address system. Some protestors erected tents and announced their intention to "occupy" the area.

¶ 8     During that evening, CPD personnel communicated with protestors and attorneys from the National Lawyers Guild (NLG) and informed them that protestors would not be permitted to remain in Grant Park after its posted 11 p.m. closing time. Specifically, the police informed the protestors and their lawyers that chapter VII, section B(2), of the Chicago Park District Code (Code) prohibited persons from remaining in Chicago parks from 11 p.m. to 6 a.m. See Chicago Park District Code, ch. VII, § B(2) (amended July 28, 1992).

¶ 9     CPD estimated that approximately 3000 protestors were in Grant Park at around 7:15 p.m. on October 15, 2011. After repeated warnings about potential arrests for violation of the Code, the number of protestors in the park decreased to between 200 and 300 people by about 10:45 p.m. Many protestors who left the park went to adjacent sidewalks on Michigan Avenue and continued to protest.

¶ 10     At approximately 1 a.m. on October 16, 2011, CPD again used the public address system to warn protestors about Grant Park's closure at 11 p.m. Chicago police officers then asked each protestor individually whether he or she wanted to leave the park or be arrested. Ultimately, police officers arrested 173 protestors who refused to leave the park for violating chapter VII, section B(2), of the Code.[1]

¶ 11     A few days later, on October 22, 2011, Occupy Chicago protestors staged another rally in the vicinity of Jackson and LaSalle Streets and again moved their rally to Grant Park. As before, protestors indicated their intention to remain in Grant Park after its 11 p.m. closure. CPD personnel followed a similar procedure, warning protestors about potential arrests and affording them the opportunity to leave. After 12:45 a.m. on October 23, 2011, Chicago police officers asked the remaining protestors if they wanted to leave the park or be arrested. After these warnings, 130 protestors were arrested for refusing to leave the park.

¶ 12     All of the protestors arrested on both dates were given court dates. Ninety-two protestors, the defendants in this appeal, filed motions to dismiss the charges.[2] Eighty of the defendants were represented by NLG, and the remaining twelve defendants were represented by the law firm of Durkin & Roberts. Both groups of defendants argued that they were engaged in constitutionally protected expressive conduct or symbolic speech and that the City selectively enforced the ordinance against them in violation of their constitutional rights to equal protection. Defendants noted that the City and CPD let people remain in Grant Park after its 11 p.m. closure for President Obama's presidential election rally in 2008.

¶ 13     Relevant to this appeal, the NLG defendants also argued that the ordinance violated their "rights under the First Amendment to the United States Constitution to freedom of speech, to assemble, and to petition the government for redress of grievances." The Durkin & Roberts

---

[1]Defendants' initial pleadings misstated the charges against them as being violations of the Chicago Municipal Code rather than the Chicago Park District Code. Ultimately, the trial court determined that defendants were charged with violating chapter VII, section B(2), of the Chicago Park District Code (Chicago Park District Code, ch. VII, § B(2) (amended July 28, 1992)).

[2]Although the initial motions to dismiss did not cite section 2-619 of the Code of Civil Procedure (735 ILCS 5/2-619 (West 2010)), the parties and trial court later agreed that those pleadings would be treated as section 2-619 motions to dismiss because this case involved a civil matter. The parties do not dispute that procedural posture before this court.

defendants argued that the charge for violating the ordinance "fails to constitute an offense under the circumstances of this very unique case and violates Defendants' rights to freedom of speech, peaceable assembly, and to petition the Government for redress of grievances," as guaranteed by the first amendment to the United States Constitution and related provisions in the Illinois Constitution of 1970. On the motion of defendants, the circuit court consolidated their cases.

¶ 14    The City filed a response, arguing that defendants' motions to dismiss should be denied because the ordinance constituted a reasonable time, place, and manner restriction on the use of Grant Park and the City's enforcement of the ordinance was appropriate. The City also argued that the ordinance was applied in a content-neutral manner and left open ample alternative channels of communication. The City attached three supporting affidavits, two of them from law enforcement officials involved in supervising the Occupy Chicago protests and the subsequent arrests.

¶ 15    The third City affidavit was from Deputy Director of Park Services Alonzo Williams. His affidavit described his duties, outlined the development of the ordinance that effectively closes Chicago parks during overnight hours, and defended the ordinance as being necessary to "keep the parks safe, clean, attractive, and in good condition." Williams's affidavit noted that groups could apply for exceptions if "both the group and its proposed activity comply with our permitting process." The fourth and final paragraph of Williams's affidavit provided additional justification for the park-closure ordinance:

> "4. We believe the Code's standard hours of closure is [*sic*] necessary to properly protect and maintain our parks. The park hours of closure allow park employees to collect trash, make repairs to park facilities, and maintain the landscaping. Park employees are therefore able to make sure the parks remain sanitary and pleasing the [*sic*] eye with limited disruption and maximum safety to park patrons. Park closures also ensure that certain park facilities do not become over-fatigued. Further, limited access by pedestrians during park closure hours reduces crime against park patrons and park property. As we are charged with keeping Chicago's parks beautiful and vibrant for current and future generations, we have made certain rules to that effect. Round-the-clock use of the parks by the general public would not further our mandate and would instead make it impossible to uphold."

¶ 16    The City also attached decisions from trial courts in Sacramento, Boston, and San Diego that addressed Occupy movements in those cities. Lastly, the City attached "Chicago Police Department Special Order 4-22-01," detailing CPD's procedure for issuing administrative notice of ordinance violation citations.

¶ 17    Defendants filed a reply and included supporting affidavits from various participants in the Occupy Chicago movement.

¶ 18    After oral arguments on the motions, the City filed motions to strike defendants' affidavits, and defendants filed a motion for discovery. The court denied in part and granted in part the City's motion to strike the affidavits and denied defendants' motion seeking discovery.

¶ 19    On September 27, 2012, the circuit court issued a 38-page "memorandum opinion and order," finding chapter VII, section B(2), of the Code unconstitutional on its face and as applied to defendants. The court held that the ordinance violated defendants' right to assembly under both the United States and Illinois Constitutions. The court explained that "the City's

claim that citizen safety, park maintenance, and park preservation constitute the substantial government interest that justifies closing the park seven hours nightly fails because the City routinely closes the park for fewer than seven hours nightly, making *ad hoc* exceptions to the curfew for permitted groups." The court further explained that the ordinance "violates the Illinois Constitution which provides a more vigorous right to free assembly, embracing even non-expressive assemblies." Lastly, the court concluded that the ordinance violates defendants' right to equal protection because it treats similarly situated citizens differently, noting that the City did not arrest anyone during President Obama's rally in 2008, despite their presence in Grant Park after its 11 p.m. closure.

¶ 20    On appeal, the appellate court reversed the circuit court's decision but did not expressly address the trial court's findings under the Illinois Constitution. This court denied defendants' petition for leave to appeal but entered a supervisory order directing the appellate court to vacate its opinion and review the circuit court's judgment that the chapter VII, section B(2), of the Chicago Park District Code violates the right to free assembly under *both* the first amendment to the United States Constitution and article I, section 5, of the Illinois Constitution.

¶ 21    The appellate court vacated its original opinion and issued a new opinion, again reversing the circuit court's judgment. Rejecting defendants' facial challenge under the first amendment to the United States Constitution, the court reasoned that the ordinance was not unconstitutional in every circumstance and was not overbroad. Addressing defendants' as-applied challenge under the first amendment, the court applied intermediate scrutiny, traditionally applicable to content-neutral regulations, and determined that defendants' first amendment rights were not violated. 2015 IL App (1st) 122858-B, ¶¶ 28-48.

¶ 22    Turning to defendants' claims under the Illinois Constitution, the appellate court explained that its "review of the 1970 Illinois Constitution debates and convention supports the conclusion that the framers intended for article I, section 5 to extend a broader right of assembly than that afforded under the United States Constitution." *Id.* ¶ 61. Nevertheless, the appellate court found "nothing to indicate that the time, place and manner analysis," which would be applicable to first amendment claims, "should be abandoned" for defendants' state claims and, after applying that analysis, concluded that the ordinance did not violate article I, section 5, of the Illinois Constitution. *Id.* ¶¶ 61-65.

¶ 23    This court allowed defendants' petition for leave to appeal. Ill. S. Ct. R. 315 (eff. Jan. 1, 2015). We also granted the Illinois Municipal League leave to file an *amicus curiae* brief in support of the City. Ill. S. Ct. R. 345 (eff. Sept. 20, 2010).

¶ 24                                          ANALYSIS

¶ 25    The ordinance at issue in this case prohibits any person from being or remaining in any city park "between the hours of 11:00 p.m. and 6:00 a.m. on the following day." Chicago Park District Code, ch. VII, § B(2) (amended July 28, 1992). The penalty for violating the ordinance is a fine not to exceed $500 and restitution in the event of property damage. Chicago Municipal Code § 10-36-185 (added Apr. 21, 1999).

¶ 26    Defendants' petition for leave to appeal sought review of two issues. First, defendants asked whether the protections afforded by article I, section 5, of the Illinois Constitution of 1970 are subject to the same "time, place, or manner" analysis that applies to the first

amendment right of assembly. Defendants' position is that the Illinois Constitution grants broader protection than the first amendment and, thus, strict scrutiny applies to an ordinance that restricts the right to conduct demonstrations in public forums such as parks, at least when the gathering is political in nature. This question requires this court to decide whether article I, section 5, of the Illinois Constitution provides broader protection than the assembly clause of the first amendment to the United States Constitution under this court's limited lockstep doctrine. Second, if this court determines that the ordinance is not subject to strict scrutiny and that the intermediate standard of time, place, or manner analysis applies, defendants ask us to apply the analysis "more robustly" than the appellate court did here.

¶ 27 The Chicago Park District Code has the same force as a municipal ordinance. *Chicago Park District v. Canfield*, 382 Ill. 218, 223-24 (1943). Thus, when considering the validity of a provision of a park district code, we treat it as a municipal ordinance, applying the same standards that govern a challenge to the constitutionality of a statute. *City of Chicago v. Pooh Bah Enterprises, Inc.*, 224 Ill. 2d 390, 406 (2006). A municipal ordinance is presumed constitutional, and the challenging party has the burden of rebutting that presumption. *Id.* Unlike a facial challenge, which requires a showing that the ordinance is unconstitutional under any set of facts, an as-applied challenge requires a showing that the ordinance violates the constitution as it applies to the facts and circumstances of the challenging party. See *People v. Rizzo*, 2016 IL 118599, ¶ 24.

¶ 28 We review *de novo* the grant of a motion to dismiss. *Richter v. Prairie Farms Dairy, Inc.*, 2016 IL 119518, ¶ 18. We also review *de novo* a determination that a legislative enactment is unconstitutional. *Kanerva v. Weems*, 2014 IL 115811, ¶ 33.

¶ 29 *The Right of Assembly Under the State Constitution*

¶ 30 The question of whether article I, section 5, of the Illinois Constitution provides greater protection for the right of assembly than the first amendment presents a question of first impression for this court.

¶ 31 We apply a "limited lockstep" approach when interpreting cognate provisions of our state and federal constitutions. *People v. Caballes*, 221 Ill. 2d 282, 297 (2006).

> "Under this approach, when the language of the provisions within our state and federal constitutions is nearly identical, departure from the United States Supreme Court's construction of the provision will generally be warranted only if we find 'in the language of our constitution, or in the debates and the committee reports of the constitutional convention, something which will indicate that the provisions of our constitution are intended to be construed differently than are similar provisions in the Federal Constitution, after which they are patterned.' " (Internal quotation marks omitted.) *Hope Clinic for Women, Ltd. v. Flores*, 2013 IL 112673, ¶ 47 (quoting *Caballes*, 221 Ill. 2d at 297).

¶ 32 Defendants argue that the "language and history" of article I, section 5, "demonstrate that the drafters intended to provide the people of Illinois with greater rights of assembly than the First Amendment." They cite *Village of South Holland v. Stein*, 373 Ill. 472, 479 (1940), for the proposition that the rights guaranteed by the state constitution are "even more far-reaching" than those guaranteed by the first amendment. They further rely upon *People v. DiGuida*, 152 Ill. 2d 104, 118 (1992), to argue that "where the language of the State constitution, or where

- 6 -

debates and committee reports of the constitutional convention show that the Framers intended a different construction," this court should "construe similar provisions in a different way from that of the [United States] Supreme Court."

¶ 33    We note that *Stein* predates the adoption of the 1970 Constitution and both *Stein* and *DiGuida* predate our 2006 decision in *People v. Caballes*. Neither *Stein* nor *DiGuida* involved the right of assembly. In addition, while *DiGuida* did, indeed, say that a state constitutional provision *may* be construed more broadly than its federal counterpart, this court declined in that case to construe the right of free speech in article I, section 4, of the state constitution more broadly than the free speech clause of the first amendment. *Id.* at 124.

¶ 34    Defendants also cite *Vineyard Christian Fellowship of Evanston, Inc. v. City of Evanston*, 250 F. Supp. 2d 961 (2003), for the proposition that the Illinois constitutional guarantee of freedom of assembly is broader than the corresponding guarantee in the United States Constitution. The federal district court in *Vineyard* did purport to be applying both the federal and state constitutions to a claim that a zoning ordinance was unconstitutional. *Id.* at 979 n.12. However, this *dictum* provides no support for defendants' position in the present case. The case cited by the district court in its footnote, *City of Blue Island v. Kozul*, 379 Ill. 511, 520 (1942), did indeed say that "the constitution of Illinois is even more far-reaching than that of the constitution of the United States in providing that every person may speak freely, write or publish on all subjects, being responsible for the abuse of that liberty." However, this statement refers to article II, section 4, of the Illinois Constitution of 1870, not to the peaceable assembly clause of the 1970 Constitution and, therefore, is not relevant to the current issue.

¶ 35    In addition, the bulk of the defendants' argument relates to what they describe as the "wholesale importation" of the first amendment time, place, or manner analysis into the application of article I, section 5, of the state constitution. This argument neglects to answer the threshold questions posed by *Caballes*: does the language of the state constitutional provision so nearly track the language of the federal constitution that the provision should be applied in lockstep with federal precedent? And, if so, is there any reason based in our history to justify a departure from lockstep? See *Caballes*, 221 Ill. 2d at 314.

¶ 36    Article I, section 5, of the Illinois Constitution provides that "[t]he people have the right to assemble in a peaceable manner, to consult for the common good, to make known their opinions to their representatives and to apply for redress of grievances." Ill. Const. 1970, art. I, § 5. The cognate provision of the United States Constitution is found in the first amendment, which provides, in pertinent part, that "Congress shall make no law *** abridging *** the right of the people peaceably to assemble ***." U.S. Const., amend. I. This right has been incorporated against state and local governments under the due process clause of the fourteenth amendment. See *De Jonge v. Oregon*, 299 U.S. 353, 365 (1937).

¶ 37    *Caballes* explained that there are "three possible scenarios" to consider when comparing the language of the state and federal constitutions. A provision may be "unique to the state constitution," it may be similar to a provision in the federal constitution "but differ from it in some significant respect," or it may be "identical to or synonymous with the federal constitutional provision." *Caballes*, 221 Ill. 2d at 289-90. Thus, the first step in our analysis must be to determine which of these three categories applies by comparing the assembly clause of the Illinois Constitution to the assembly clause in the first amendment of the United States Constitution.

¶ 38    The phrases "to assemble in a peaceable manner" and "peaceably to assemble" are virtually identical. Both use the verb "assemble"; one uses the adjectival phrase "peaceable manner," while the other uses the adverb "peaceably" to convey the same meaning. On the basis of the language alone, we see no significant difference between the two constitutions with regard to the right of assembly.

¶ 39    Defendants, however, point to the history of this provision to suggest that these virtually identical words convey a different meaning. We, thus, turn to the evolution of this provision throughout our state's history.

¶ 40    Illinois became a state on December 3, 1818. Our first state constitution provided in article VIII, section 19, that "the people have a right to assemble together in a peaceable manner to consult for their common good, to instruct their representatives, and to apply to the general assembly for redress of grievances." Ill. Const. 1818, art. VIII, § 19. Unfortunately, most of the records of the 1818 Constitutional Convention were lost or destroyed by 1891. See Elliott Anthony, The Constitutional History of Illinois (1891). We do know that the first state constitutional convention lasted for three weeks in August 1818 and that the drafters relied heavily on the constitutions of other states to provide the wording. Ohio, Kentucky, Tennessee, and Indiana were specifically noted as providing "[t]he wording of the Illinois Bill of Rights ***, with little thought given to changes in these basic statements of individual rights." Janet Cornelius, Constitution Making in Illinois, 1818-1970, at 16-17.

¶ 41    This provision remained unchanged in the 1848 Constitution, which provided in article XIII, section 21, that "the people have a right to assemble together in a peaceable manner to consult for their common good, to instruct their representatives, and to apply to the general assembly for redress of grievances." Ill. Const. 1848, art. XIII, § 21. However, *The Constitutional Debates of 1847* contains no relevant discussion of this provision.

¶ 42    This language was altered slightly in the 1870 Illinois Constitution, which continued to protect a right to assembly through its guarantee that "[t]he people have the right to assemble in a peaceable manner to consult for the common good, to make known their opinions to their Representatives, and to apply for redress of grievances." Ill. Const. 1870, art. II, § 17.

¶ 43    Although the fourteenth amendment had been ratified in 1868, the guarantees of the Bill of Rights had not yet been incorporated against the states. See *Barron v. Baltimore*, 32 U.S. 243 (1833) (holding that the Bill of Rights applied only to the federal government); *United States v. Cruikshank*, 92 U.S. 542, 554-55 (1875) (despite ratification of the fourteenth amendment in 1868, the first and second amendments to the United States Constitution did not apply to state governments). Thus, the drafters of the 1870 Constitution were aware that if the people of Illinois were to be guaranteed the same rights under state law as they were guaranteed under federal law, our state constitution would have to expressly protect those rights.[3] Yet nothing in the record of the 1870 constitutional convention reveals an intent to do more than that with regard to freedom of assembly; nothing in the case law decided under that constitution reveals

---

[3]Incorporation of provisions of the United States Constitution against the states pursuant to the fourteenth amendment began with *Gitlow v. New York*, 268 U.S. 652, 666 (1925) (assuming, *arguendo*, that the first amendment right of freedom of speech is one of the liberties protected from impairment by the states under the due process clause of the fourteenth amendment).

- 8 -

an understanding that the state constitution was more protective of the right of assembly than the federal constitution.

¶ 44 The landscape changed in 1937 when the United States Supreme Court expressly incorporated the first amendment guarantee of freedom of assembly against the states in *De Jonge*.[4] After incorporation, a state constitutional provision that was more protective of the right of assembly than the first amendment would pass constitutional muster, but a statute that was less protective would violate the United States Constitution. See *Caballes*, 221 Ill. 2d at 314 ("[S]tate courts are free to independently construe their state constitutions to provide more protection than the federal constitution.").

¶ 45 Notably, in our 1870 Constitution, no comma appeared after the words "peaceable manner." Thus, the 1870 Constitution protected the right to assemble for three enumerated purposes: "to consult for the common good, to make known their opinions to their representatives and to apply for redress of grievances." Giving effect to the presence of commas in a series of restrictive clauses,[5] it did not protect the right to assemble for any other purpose.

¶ 46 In the years between 1937 and 1970, this court did not have occasion to address or resolve this apparent tension between the two provisions. If the issue had been presented, it would have been necessary to conclude that the Illinois provision was unconstitutional. The question was not clearly addressed in *City of Chicago v. Joyce*, 38 Ill. 2d 368, 371 (1967), when this court affirmed the conviction for disorderly conduct of a protestor who blocked entrance to city hall and obstructed pedestrian traffic on the basis that such conduct "has no connection with the constitutional protections she seeks to invoke." The defendant's argument did not specify whether she was claiming violation of the state or federal constitution, and this court did not distinguish between the state constitutional guarantee of freedom of assembly and the first amendment guarantee. However, in reaching its decision, this court relied on *Cox v. Louisiana*, 379 U.S. 536, 554 (1965), thus implicitly acknowledging that federal precedent applied.

¶ 47 In 1965, the Illinois General Assembly created the Illinois Constitutional Study Commission. A comment by Melvin Rishe was submitted to the Commission. See Melvin Rishe, Comment, *Freedom of Assembly*, 15 DePaul L. Rev. 317 (1966). This comment

---

[4]For example, prior to incorporation of the religion clauses of the first amendment (see *Everson v. Board of Education*, 330 U.S. 1 (1947) (establishment of religion); *Cantwell v. Connecticut*, 310 U.S. 296 (1940) (free exercise of religion)), this court held in *People ex rel. Ring v. Board of Education of District 24*, 245 Ill. 334, 338 (1910), that the first amendment to the federal constitution prohibits Congress, but not the states, from "making any law respecting an establishment of religion or prohibiting the free exercise thereof." Further, this court noted that the states "are thus left free to enact such laws in respect to religion as they may deem proper, restrained only by the limitations of the respective State constitutions." *Id.* In *Ring*, this court held that a practice of Bible reading, hymn singing, and praying in the public schools violated article VIII, section 3, of the Illinois Constitution of 1870. *Id.* at 352.

[5]See, *e.g.*, *Rich v. Principal Life Insurance Co.*, 226 Ill. 2d 359, 374 (2007) (concluding that the absence of a comma in a policy limitation provision indicated a series of restrictive clauses that identified or defined the antecedent noun (citing William Strunk & E.B. White, The Elements of Style 3-4 (3d ed. 1979) (discussing restrictive and nonrestrictive clauses)).

provides useful insight into the history of the provision and its subsequent amendment in the 1970 Constitution.

¶ 48     The author noted that by 1965, "[a]ll but two states constitutionally guarantee[d] the right of assembly," and most of the state assembly clauses were "similar to the provision of the first amendment." *Id.* at 336. However, the constitutions of "[t]hirty nine states, including Illinois, ha[d] qualified the *right of the people peaceably to assemble*, by inserting the phrase 'for the common good.' " (Emphasis in original.) *Id.* The author observed that:

> "It is somewhat strange that this clause should have found its way into so many of the states' constitutions and not into the federal constitution. At the Constitutional Convention of 1787, the delegates, contending that the Constitution should contain a declaration of freedoms, proposed amendments for this purpose and most of the clauses pertinent to the right of assembly contained the phrase 'for the common good.' Yet, when the Bill of Rights was adopted by the Convention, this phrase was deleted from the guarantee of assembly." *Id.* (citing Edward Dumbauld, The Bill of Rights 172-205 (1957)).

¶ 49     The author rejected the suggestion that this exclusion was inadvertent, noting that the framers of the constitution and the Bill of Rights "were extremely careful in their choice of words so that there is reason to believe that there was a purpose in drafting the first amendment without the proposed phrase *for the common good*." (Emphasis in original.) *Id.* at 336-37.

> "The historical setting of the constitutional Convention and the court's interpretation of the right of assembly point out that,
>
> '[n]o purpose in ratifying the Bill of Rights was clearer than that of securing for the people of the United States much greater freedom of religion, expression, assembly, and petition than the people of Great Britain had ever enjoyed. It cannot be denied, for example, that [the] restrictions upon assembly then prevalent in England would have been regarded as measures which the Constitution prohibited the American Congress from passing. . . . Ratified as it was while the memory of many oppressive English restrictions on the enumerated liberties was still fresh, the First Amendment cannot reasonably be taken as approving prevalent English practices. On the contrary, the only conclusion supported by history is that the unqualified prohibitions laid down by the framers were intended to give [the liberties enumerated] the broadest scope that could be countenanced in an orderly society.' " *Id.* at 337 (quoting *Bridges v. California*, 314 U.S. 252, 265 (1941)).

¶ 50     The author further explained that "[t]he clause, for the common good, qualifies an otherwise unqualified provision: it is ambiguous and undefined. Few Americans will consider a meeting to advocate fascism for the common good. *** A meeting condemning Negroes and Jews does not serve the common good, but the United States Supreme Court has held such an assembly guaranteed by the constitution." *Id.* (citing *Terminiello v. City of Chicago*, 337 U.S. 1, 4-5 (1949) (reversing this court's affirmance of a conviction for disorderly conduct on the basis that *De Jonge* had incorporated the right of assembly against the states and that the city ordinance was too restrictive of first amendment rights)). As author Rishe noted, "Were the courts truly bound to delve into whether or not an assembly served the common good, it is likely that many assemblies that have been held to be protected by the constitution would lose this protection." *Id.*

¶ 51 Turning to the Illinois Constitution, the author noted that the right to freedom of assembly in article II, section 17, of the Illinois Constitution of 1870 "differs substantively from the federal constitution only in the insertion of the 'common good' clause. This is a limitation on the general right \*\*\*." *Id.* at 338. Taking the language literally, he opined, many "would be denied their right to assemble because their assembly does not meet the standard of the common good." *Id.*

¶ 52 In light of this background, we turn to the question raised by the parties—the significance of the insertion of a comma in the 1970 Constitution. Defendants argue that the addition of this comma creates an independent right to assemble, with no limitation on its purpose so that it would apply to those that involve traditionally expressive conduct, like political protests, and those that do not. This, they assert, indicates that the Illinois provision provides broader rights than the federal provision.

¶ 53 The records of the 1970 Constitutional Convention, however, demonstrate the delegates' awareness of the incorporation doctrine, the link between the state right of assembly provision and the cognate provision in the United States Constitution, as well as their intent that the two provisions remain in harmony. For example, the vice president of the convention observed that existing section 17 was "quite parallel \*\*\* to the First Amendment of the United States Constitution." 3 Record of Proceedings, Sixth Illinois Constitutional Convention 1488 (statements of Vice President Smith). Another delegate referred to the bill of rights in the state constitution as "almost surplusage" in light of the guarantees of the federal constitution but urged retention of Illinois's language, that is, the common good clause, for its "historical resonance." 4 Record of Proceedings, Sixth Illinois Constitutional Convention 3645 (statements of Delegate Foster).

¶ 54 We conclude that the addition of the comma, as a matter of grammatical construction, altered the meaning of this section but not in the manner suggested by the defendants. Under the 1870 Constitution, the right to peaceably assemble was limited to three purposes: to consult for the common good, to make known opinions to elected representatives, and to apply for redress of grievances. As such, it had been out of step with the United States Constitution since 1937, and these limitations were, therefore, ineffective. See *Terminiello*, 337 U.S. at 4-5. The addition of the comma corrected this inconsistency, resulting in a state constitutional provision that now lists four independent rights: the right of the people to peaceably assemble, their right to consult for the common good, the right to make known their opinions to their representatives, and their right to apply for redress of grievances.

¶ 55 Our conclusion is supported by the 1970 Illinois constitutional debates and convention. Specifically, Father Francis Lawlor, speaking on behalf of the Bill of Rights Committee, explained that "[t]he purpose of inserting a comma after the word 'manner' was to assure that the right to assemble in a peaceable manner was an independent right, not subject to qualification by any of the succeeding phrases." 3 Record of Proceedings, Sixth Constitutional Convention 1480 (statements of Delegate Lawlor). Father Lawlor further explained that "people have the right to assemble in a peaceable manner, even though their purpose is other than to consult for the common good, or to make known their opinions to their representatives, or to apply for redress of grievances." *Id.* Father Lawlor's comments echo the concerns raised by Rishe in his comment.

¶ 56    Further, the official text of the proposed new constitution and the accompanying explanation that were provided to voters described the change from the 1870 language to the proposed new language of article I, section 5, as "requiring only that an assembly for any purpose be peaceable." 7 Record of Proceedings, Sixth Illinois Constitutional Convention 2683.

¶ 57    We therefore hold that because the two provisions are virtually identical in language and were intended by the drafters of the Illinois Constitution of 1970 to express the same meaning, the right to assemble guaranteed in article I, section 5, of the Illinois Constitution of 1970 is to be interpreted and applied in lockstep with the federal precedents interpreting and applying the assembly clause of the first amendment of the United States Constitution.

¶ 58    *Presence of Language Unique to the Illinois Constitution of 1970*

¶ 59    In *Caballes*, we noted that a provision "may be unique to the state constitution and, therefore, must be interpreted without reference to a federal counterpart." *Caballes*, 221 Ill. 2d at 289. Article I, section 5, of the Illinois Constitution of 1970 contains such unique language, specifically, the language referring to the right to consult for the common good and the right to make opinions known to one's representatives.

¶ 60    Our holding above is quite similar to our holding in *Caballes*, where we noted that article I, section 6, of the 1970 Constitution contained not only the search and seizure clause but also included "two new clauses, each of which created a right not expressly stated in the 1870 constitution," and not contained in the fourth amendment to the United States Constitution. *Caballes*, 221 Ill. 2d at 293. These are the "right to be secure against unreasonable invasions of privacy by the state and the right to be secure against unreasonable interceptions of communications by the state." *Id.* The presence of this additional language, however, did not affect our decision to continue to interpret the search and seizure clause of article I, section 6, of the Illinois Constitution in lockstep with the search and seizure clause of the fourth amendment to the United States Constitution.

¶ 61    Similarly, the presence of additional language in article I, section 5, does not weigh against interpreting and applying the assembly clause of the Illinois Constitution in lockstep with the corresponding clause in the first amendment.

¶ 62    That said, in their reply brief, defendants argue that the ban on overnight assembly in Grant Park also violates their independent rights under the Illinois Constitution to "consult for the common good" and "to make known their opinions to their representatives."

¶ 63    We need not determine the contours of these two separate "rights" for two reasons. First, defendants have forfeited any issues regarding violations of these separate rights by not raising them as separate issues in their petition for leave to appeal. *Buenz v. Frontline Transportation Co.*, 227 Ill. 2d 302, 320-21 (2008) (failure to raise an issue in a petition for leave to appeal forfeits the issue on the merits). Second, even if the argument were properly presented, defendants have posited no nexus between their desire to exercise these rights and the need to gather together in Grant Park during the overnight hours. Defendants argue only that their right to consult with "passers-by" for the common good is impaired by the park's closing, when law-abiding members of the public would not be present.

¶ 64    We thus leave for a later date any consideration of the scope of the language "to consult for the common good, to make known their opinions to their representatives" and of whether these

- 12 -

words protect actions not otherwise protected by the first amendment.

¶ 65    *Application of Time, Place, and Manner Analysis in Lockstep*

¶ 66    Under the United States Supreme Court's jurisprudence regarding the right of assembly, which we apply in lockstep, this court applies intermediate scrutiny to content-neutral regulations that affect the time, place, or manner of expression. See *People ex rel. Ryan v. World Church of the Creator*, 198 Ill. 2d 115, 120 (2001); *People v. Jones*, 188 Ill. 2d 352, 356-57 (1999); *City of Chicago v. Lynd*, 47 Ill. 2d 205, 208-09 (1970); *Chicago Park District v. Lyons*, 39 Ill. 2d 584, 590-91 (1968). Under that standard, a time, place, or manner regulation must not only be content-neutral, it must be "narrowly tailored to serve a significant government interest, and must leave open ample alternative channels for communication of the information." *Jones*, 188 Ill. 2d at 356-57.

¶ 67    By holding that the lockstep doctrine applies and that we will be guided by federal precedent, we have rejected defendants' argument that we should apply strict scrutiny to an ordinance affecting the right of assembly. Defendants, however, have argued in the alternative that if intermediate scrutiny is proper, this court should apply the time, place, and manner analysis "more robustly" than it was applied by the appellate court.

¶ 68    In their petition for leave to appeal, defendants argued that the appellate court erred by relying on the affidavit from the park district official to find that the ordinance is narrowly tailored to serve a significant government interest; they argued further that the appellate court's finding of ample alternative channels of communication for their protected conduct "defie[d] common sense and practicality." In their brief, they argued that the appellate court applied the time, place, and manner standard "with insufficient rigor," continuing to invoke the "broader rights" that they claimed article I, section 5, of the Illinois Constitution guarantees.

¶ 69    We find it unclear from the defendants' petition for leave to appeal and their brief whether this argument is intended to be an argument for departure from lockstep, which we have already rejected, or an argument that the appellate court improperly applied the standard mandated by lockstep.

¶ 70    When questioned at oral argument on the exact nature of this argument, defendants' counsel confirmed that they sought review only of the appellate court's rejection of their Illinois constitutional challenge to the ordinance.

¶ 71    Thus, any claim by defendants that the appellate court failed to properly conduct intermediate review under the applicable first amendment jurisprudence is forfeited. *Buenz*, 227 Ill. 2d at 320-21. Their petition for leave to appeal did not preserve the application of federal law as a separate issue. Their brief did not argue this issue except in the context of arguing for a departure from lockstep based on their claim of broader protection of the right of assembly under the Illinois Constitution.

¶ 72    We, therefore, agree with the City that defendants have forfeited any challenge to the appellate court's application of first amendment jurisprudence and, by logical extension, to its ultimate conclusion that the ordinance is not unconstitutional as applied to them.

¶ 73                                CONCLUSION

¶ 74    For these reasons, we vacate that portion of the appellate court's opinion stating that the Illinois Constitution provides broader protection for the right of assembly than the United

States Constitution. In all other respects, we affirm the appellate court's judgment that rejected defendants' constitutional challenge to the ordinance under article I, section 5, of the Illinois Constitution.

¶ 75    Appellate court judgment affirmed.

¶ 76    Circuit court judgment reversed and remanded.

¶ 77    JUSTICE KILBRIDE, dissenting:

¶ 78    The only issue in this case is whether the challenged Chicago Park District ordinance is unconstitutional as applied to defendants under article I, section 5, of the Illinois Constitution (Ill. Const. 1970, art. I, § 5), a point confirmed at oral argument. Remarkably, despite the clear framing of this issue, the majority concludes that defendants have "forfeited" their substantive as-applied challenge under the Illinois Constitution. See *supra* ¶ 72 (determining that defendants have "forfeited any challenge to the appellate court's *** ultimate conclusion that the ordinance is not unconstitutional as applied to them"). I cannot agree. More critically, because the majority effectively endorses the resolution of an as-applied constitutional challenge in the absence of an evidentiary hearing and on a record inadequate to resolve that claim, I must dissent.

¶ 79    Forfeiture "is the failure to make the timely assertion of [a] right." (Internal quotation marks omitted.) *Gallagher v. Lenart*, 226 Ill. 2d 208, 229 (2007). Although an issue may be considered forfeited if not raised in a petition for leave to appeal (*Buenz v. Frontline Transportation Co.*, 227 Ill. 2d 302, 320-21 (2008)), defendants did, in fact, raise their as-applied constitutional challenge in their petition for leave to appeal. As the majority correctly acknowledges:

> "We allowed defendants' petition for leave to appeal pursuant to Illinois Supreme Court Rule 315 (eff. Jan. 1, 2015) to determine whether the ordinance, which closes all Chicago public parks between 11 p.m. and 6 a.m. and prohibits people from being inside any park during these hours, is unconstitutional as applied to defendants under article I, section 5, of the Illinois Constitution (Ill. Const. 1970, art. I, § 5)." *Supra* ¶ 2.

Thus, it is simply inaccurate to claim, as the majority does, that defendants' substantive as-applied constitutional challenge to the ordinance has been "forfeited." *Supra* ¶ 72.

¶ 80    The majority's approach is also confusing. Why does the majority bother conducting a limited lockstep analysis if defendants' underlying constitutional claim has been forfeited? It is settled that "cases should be decided on nonconstitutional grounds whenever possible, reaching constitutional issues only as a last resort." *In re E.H.*, 224 Ill. 2d 172, 178 (2006) (collecting cases). If defendants' as-applied challenge under the Illinois Constitution is forfeited there is no need for the majority to engage in its extensive limited lockstep analysis or conduct any constitutional analysis for that matter.

¶ 81    I also find it unusual for this court to issue initially a supervisory order directing the appellate court to address the merits of defendants' claims under the Illinois Constitution, including their as-applied constitutional challenge, but then decline to reach that same exact claim when the case returned to this court—as the majority does now. See *City of Chicago v. Alexander*, No. 118799 (Ill. May 27, 2015) (supervisory order) (this court earlier directing the appellate court to vacate its original opinion in defendants' case and to "review the circuit

- 14 -

court's judgment that [the challenged ordinance] violates the right to free assembly under both the first amendment to the United States Constitution and article I, section 5 of the Illinois Constitution"); see also *People v. Hughes*, 2015 IL 117242, ¶ 64 (Burke, J., specially concurring, joined by Thomas and Kilbride, JJ.) (asserting that "[i]f an issue is of such importance to the proceedings that the parties must be ordered to submit additional briefing, then surely it is a matter that must be addressed by this court" (emphasis omitted)).

¶ 82    Rather than resolving defendants' as-applied constitutional challenge on the questionable basis of forfeiture, I would address it substantively. Both parties have fully briefed the issue. This case is not only important for the parties but also involves a matter of public interest. On multiple separate occasions, and as recently as this year, Illinois citizens have assembled in public forums in Chicago and throughout the state to engage in constitutionally protected speech activity on a variety of political, social, and governmental concerns. Defendants also chose to assemble in a public space. They assembled in Chicago's Grant Park to protest wealth inequality, corporate political influences, and the government's response to those issues. Those concerns are undoubtedly shared by many of their fellow citizens in Illinois, not to mention people across the country.

¶ 83    As this court has long recognized, municipalities are permitted to "adopt regulatory provisions governing the use of public property to the extent that such regulations are compatible with constitutional guaranties of free speech and press." *Chicago Park District v. Lyons*, 39 Ill. 2d 584, 587 (1968). Without question, this principle applies equally to the right to assembly protected by article I, section 5, of the Illinois Constitution. Unfortunately, by choosing to resolve defendants' as-applied challenge on the basis of forfeiture, the majority fails to clarify the scope of permissible governmental restriction on that right.

¶ 84    If the majority were to engage defendants' substantive challenge under the Illinois Constitution, I believe they would reach the same conclusion that I do—the record in this case is woefully inadequate to resolve defendants' as-applied challenge under article I, section 5.

¶ 85    To succeed on their challenge to the ordinance, defendants must establish that the ordinance is unconstitutional as applied to them. *People v. Minnis*, 2016 IL 119563, ¶ 18 (citing *People v. Garvin*, 219 Ill. 2d 104, 117 (2006)). It is settled that an as-applied constitutional challenge is inherently fact intensive because it depends on the particular facts and circumstances of the challenging party in each individual case. *Minnis*, 2016 IL 119563, ¶ 18; *In re M.A.*, 2015 IL 118049, ¶¶ 39-40; *People v. Thompson*, 2015 IL 118151, ¶ 36. Because of the factual focus of an as-applied challenge, this court has emphasized that it is fundamentally different than a facial challenge. See *People v. Rizzo*, 2016 IL 118599, ¶ 24 (noting that "[t]his court has recently reiterated that facial and as-applied challenges are not interchangeable, and there are fundamental distinctions between them").

¶ 86    Logically, in most if not all cases, an evidentiary hearing will be required to resolve an as-applied constitutional challenge. This is true because, unlike a facial challenge, an as-applied challenge generally requires a factual evidentiary basis related to the specific circumstances of the particular case. *Thompson*, 2015 IL 118151, ¶ 36. A trial court's failure to conduct an evidentiary hearing before declaring an as-applied constitutional violation is improper because "[i]n such a factual vacuum, a court is not capable of making an 'as applied' determination of unconstitutionality." *Minnis*, 2016 IL 119563, ¶ 19; see also *Rizzo*, 2016 IL

118599, ¶ 26 (concluding that a circuit court cannot make an as-applied constitutional ruling in the absence of an evidentiary hearing); *People v. Mosley*, 2015 IL 115872, ¶ 46 (same).

¶ 87   Here, in one of defendants' responsive pleadings, defendants suggested that "an evidentiary hearing may be required if the court determines that it cannot grant defendants' motion based solely on defendants' legal arguments." Defendants also filed a motion for discovery. The trial court, however, denied the motion for discovery and did not conduct an evidentiary hearing. Ultimately, the trial court determined, in relevant part, that the ordinance was unconstitutional as applied to defendants under article I, section 5, of the Illinois Constitution of 1970, without conducting an evidentiary hearing.

¶ 88   In my opinion, the trial court's ruling on defendants' as-applied constitutional issue was premature. This conclusion becomes readily apparent after reviewing the record. Notably, the record contains minimal evidence on the most critical issues in this case—whether, as applied to defendants' case, the ordinance's nightly closing of Chicago public parks is narrowly tailored to serve a significant government interest and whether it allows ample alternative channels of communication. See *People v. Jones*, 188 Ill. 2d 352, 356-57 (1999) (for content-neutral statutes that constitute time, place, or manner restrictions on speech, the key issue is whether the restriction is narrowly tailored to serve the government's interest and whether it allows ample alternative channels of communication).

¶ 89   Chicago's Grant Park, the historically significant public venue at issue here, is a vast public space that consists of approximately 319 acres. It is not clear from the record how much space within that expansive public area was actually used by defendants. Presumably, it was much less than 319 acres. Nor is there any evidence in the record on how much time is needed within the nightly 11 p.m. to 6 a.m. closure to maintain the limited area used by defendants. Defendants note that other large urban areas, including Washington, D.C., San Diego, and Boston, successfully maintain 24-hour access to their large public parks.

¶ 90   The bulk of the record consists of affidavits that provide largely irrelevant general background information but not specific facts that address defendants' as-applied challenge. Only one of the City's three affidavits, from Deputy Director of Park Services Williams, provides pertinent information on the rationale underlying the ordinance's closing requirements. Even that information, however, consists of a single paragraph that fails to address the circumstances presented here. Highlighting the sheer lack of information specific to defendants' as-applied challenge, the only evidence in the record arguably relevant to defendants' claims provides as follows:

> "4. We believe the Code's standard hours of closure is [*sic*] necessary to properly protect and maintain our parks. The park hours of closure allow park employees to collect trash, make repairs to park facilities, and maintain the landscaping. Park employees are therefore able to make sure the parks remain sanitary and pleasing the [*sic*] eye with limited disruption and maximum safety to park patrons. Park closures also ensure that certain park facilities do not become over-fatigued. Further, limited access by pedestrians during park closure hours reduces crime against park patrons and park property. As we are charged with keeping Chicago's parks beautiful and vibrant for current and future generations, we have made certain rules to that effect. Round-the-clock use of the parks by the general public would not further our mandate and would instead make it impossible to uphold."

These generic statements of park policy are not supported by any evidence in the record, let alone evidence specific to the facts of defendants' case. See, *e.g.*, *Thompson*, 2015 IL 118151, ¶ 36 (resolving an as-applied constitutional challenge requires consideration of the facts and circumstances specific to the challenging party).

¶ 91 Thus, the only evidence in the record pertinent to defendants' as-applied challenge consists of conclusory statements from a Chicago Park District official that fail to address any facts relevant to defendants. Simply put, the record here cannot reasonably be deemed adequate to address defendants' as-applied constitutional challenge. See *Horina v. City of Granite City*, 538 F.3d 624, 633-34 (7th Cir. 2008) (when reviewing a content-neutral time, place, and manner restriction on protected speech activity, the government should provide "objective evidence" showing the restriction serves a government interest under the specific facts of a case); *Weinberg v. City of Chicago*, 310 F.3d 1029, 1039 (7th Cir. 2002) (making similar conclusion and stating that "[u]sing a speech restrictive blanket with little or no factual justification flies in the face of preserving one of our most cherished rights").

¶ 92 The constitutional right to assembly guaranteed to our citizens under the Illinois Constitution is central to a healthy democracy and must be zealously guarded. I disagree with the majority's implicit acceptance of the City's meager justification for the restriction on defendants' constitutional rights to expressive assembly. A few conclusory statements from a City representative are insufficient to resolve such an important issue, and the record contains no other evidence specific to defendants' as-applied challenge. Consistent with this court's refusal to make "as applied" constitutional determinations without evidentiary hearings, I would remand this case for an evidentiary hearing on defendants' as-applied challenge to the ordinance under article I, section 5, of the Illinois Constitution. See *Minnis*, 2016 IL 119563, ¶ 19 (refusing to consider an as-applied challenge in the absence of an evidentiary hearing); *Rizzo*, 2016 IL 118599, ¶ 26 (determining that a circuit court cannot make an as-applied constitutional ruling in the absence of an evidentiary hearing); *Mosley*, 2015 IL 115872, ¶ 46 (same). For these reasons, I respectfully dissent.